UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
TRAVELEX CANADA LIMITED,

                      Plaintiff,

                                                          07-cv-9747 (GBD)(DF)

  -against-

LEIGHANNA MORBEY and
AFEX-ASSOCIATED FOREIGN EXCHANGE, INC.,

                      Defendants.
----------------------------------------------------------------x

## AFFIDAVIT IN OPPOSITION TO ORDER TO SHOW CAUSE

STATE OF NEW YORK)
COUNTY OF NEW YORK) ss.:

      LEIGHANNA MORBEY, being duly sworn, deposes and states:

      1.     I am one of the defendants in this action and as such am fully familiar with the facts and circumstances contained herein. I make this affidavit in opposition to the Order to Show Cause filed by plaintiff, Travelex Canada Limited ("Travelex").

      2.     Travelex is not entitled to the relief requested herein. I have not taken any customer list of Travelex nor am I in possession of trade secrets or confidential information of Travelex. The Agreement on Confidentiality and Non-Solicitation (the "Confidentiality Agreement") attached to Travelex's motion was signed in connection with my initial employment as a regional account manager not in connection with my subsequent position as corporate trader. While I do not believe that I am in violation of any obligation to Travelex, they are certainly not irreparably harmed by any action I have taken and they should not be entitled to injunctive relief.

1

3. Travelex is one of the largest multinational foreign exchange companies. The Travelex's website notes that it is part of the "Travelex Group" which operates in five continents, employs over 6,000 people, services over 35,000 commercial customers and has just completed the acquisition of Ruesch International, one of its largest competitors. In 2005 the Travelex Group, a British conglomerate, generated over £526,000,000.00 resulting in more than £50,000,000.00 in profit.

4. Then first issue I must stress is that I did not take, download or otherwise obtain a Travelex customer list. The affidavit submitted by Rhonda Powers ("Powers") contains purposeful misrepresentations as to that allegation. The facts surrounding my resignation were not as described nor was I found to have been printing my contact list.

5. Powers was only my supervisor for the last six or so months of my employment at Travelex. She worked across the desk from me. Kina Lamarche ("Lamarche"), Vice-President of Trading, was her supervisor and had an office which physically overlooked the trading area where my desk was located. My desk, and the desks of the other corporate traders, was in an open location without dividers. All of our desks were grouped together and we were under constant supervision and viewing at all times.

6. During my years at Travelex I began storing my <u>personal contact information</u> on the Outlook Express program on the computer at work as I would often keep in touch with friends and family via email. The Outlook Express also contained the contact information for many Travelex customers. On or about August 1, 2007 I had been considering leaving Travelex. I had not accepted a new position at that time, but I was anticipating leaving Travelex in the near future. In anticipation of my resignation I wanted to retrieve my personal contact information

from Outlook Express. I had just bought a new Blackberry (for personal use, with my own money) and wanted to put all of my personal contact information on the Blackberry.[1] I was accomplishing this by highlighting the personal contact information and then copying and pasting this information onto a blank Word document that I was going to print out.

7. As a corporate trader I was constantly on the telephone taking calls, giving quotes or effecting trades. The process of copying my personal contact list took considerable time. It was obvious, as my desk was in plain view, that I was doing something on the computer other than working. I was not concerned about what people saw as I was not doing anything improper.

8. Powers, who was sitting across from me, apparently saw me doing work on my computer and asked to have a talk. We went to a private location where she advised me that there were rumors regarding my departure and cautioned me against taking company information. I assured her that I was only copying my personal contact information to put on my new Blackberry. I had this same communication with Lamarche. I offered to show both of them what I had been doing but neither chose to do so and they never mentioned this to me again. On August 14, 2007 I decided to accept a position at AFEX and resigned from Travelex on August 15, 2007. Contrary to Power's assertion, there was no investigation regarding the copying of my personal contact information and I was not requested to resign. No one even asked to look at my papers when I left as they knew that I did not take anything from Travelex.

9. Powers has provided this Court with other factually incorrect information. I was not a regional account manager ("RAM") from September 3, 2002 to August 15, 2007. I was only a RAM from 3 months and then became a corporate trader.

---

[1] I also had been planning a baby shower for a friend and needed to have all of that information.

10.	I was first hired by Travelex as a RAM earning $35,000.00 CAD annually. This was reflected in my written offer of employment from Travelex dated August 16, 2002 and signed John Alexander, the RAM Manager, and by me on September 3, 2002, which letter is attached to the Power's affidavit as Exhibit 2. As noted in the offer of employment, the first three months of employment were probationary. In connection with this offer to be employed as <u>regional account manager</u> I was asked to sign the Confidentiality Agreement which is annexed to the Power's affidavit as Exhibit 1. This agreement was not negotiated. It is a stock agreement prepared by Travelex. In fact, a review of the second paragraph in Section 1.4 discloses that my name "Leighanna", was simply inserted in every location that a "name" was required despite the fact that the "name" was supposed to be that of a customer.[2]

10.	However, Powers purposely misleads this Court in stating that I was employed as a "Regional Account Manager from September 3, 2002 until [my] resignation on August 15, 2007." (¶9) In fact, only three months after I began working for Travelex, the end of the probationary period, the entire RAM department was eliminated and the employees terminated. When this happened Lamarche pulled me aside and told me that she would like to hire me as a corporate trader.

11.	The corporate trader position was a different position, in a different department, under different supervision, with different responsibilities and pay structure.[3] I accepted the

---

[2] The Section states "Leighanna agrees to keep and maintain adequate records of all Confidential Information and to furnish the Company upon request a complete list of the address of any new customer/clients, to report all [unreadable] employment so that, upon the termination of such employment, the Company will have correct <u>Leighannas</u> and places of business of all of the Company's customers/clients known the Leighanna. Leighanna further agrees to immediately notify the Company of the <u>Leighannas</u> and a complete list of the correct <u>Leighannas</u> and addresses of its customers/clients." (emphasis added)

[3] In 2007 I was on track for annual compensation of salary and commissions of less than $100,000.00 CAD.

position and had been a corporate trader from 2003 until my resignation[4]. Power's fabrication is obvious in that she claims she was my RAM supervisor yet refers to herself as a Corporate Trader Manager not a RAM manager. In fact, she was never my RAM Manager and was only my corporate trader supervisor during my last six month of my employment at Travelex.

12. The reason that Travelex would have this Court believe that I never changed my employment is so that they may rely upon the Confidentiality Agreement which was signed in connection with my employment as a RAM. However, in connection with becoming a corporate trader I was provided with a new offer of employment which was signed by both Lamarche and myself. I do not have a copy of their offer letter. Tellingly, Travelex has purposely failed to attach it to its motion misleading this court as to my responsibilities and obligations at Travelex as a corporate trader.

13. The RAM position and corporate trader position are vastly different positions with vastly different obligations. The RAM position was primarily a sales position soliciting sales from small companies. I, along with the other RAM, would be given list of customer leads from which I would try to solicit new business. If any new business came in it would go to the trading department. As a corporate trader, though, I was provided with a specified list of customers from the corporate account manager (not regional account manager) and would respond to the customers' requests for rate quotes on a foreign currency exchange and, upon a successful quote, would execute the trade.

14. The users or potential users of a foreign exchange company are any entity that might have to process an international transaction. As such, the identification of these entities is easily discoverable. Besides using the Google search engine, looking for import/export

---

[4] Travelex eventually changed the title to dealer sales but that change was not officially incorporated.

companies, there are lead list companies which, for a fee, provide thousands of company names and contact information specified to whatever industry is requested. In addition to general import/export companies, the list can be selected based upon industry such as art or antique dealers, wine merchants or freight companies. The names of Travelex's customers are generally available in the market as being users of foreign exchange services and would be solicited by various foreign exchange companies on an ongoing basis from any of these available lead lists or Google searches. The primary manner in which Travelex, itself, seeks out new clients is through its account managers who made hundreds of cold calls each day based upon customer leads. It should be noted that, in making these calls account managers would often "name drop" existing Travelex customers to the potential customer to gain a level of trust and respectability. There was no great effort or system employed to ensure the confidentiality of the names of the customers.

15.    The rates for the exchange of foreign currency is based upon an established market. The rates for buying and selling currency is exactly the same for all foreign exchange companies as they place their trades through the same market. The manner in which a foreign exchange company makes its money is by placing a premium, or margin, on the amount a customer will pay for an exchange of foreign currency. Travelex's fee structure, as is the structure of all foreign exchange companies, is to obtain the highest margin on each transaction without sacrificing the client's continued use of the foreign exchange company. The margin is not a static figure and changes for each trade, even to the same customer, depending on various factors, including, the general competition, market conditions and sale quota requirements.

16.    Most of the companies that use the services of a foreign exchange company on a regular basis do so on a non-exclusive basis and have accounts at several foreign exchange or

banking entities. That is because at any particular time they may want to "shop around" for the best rate, which really entails finding the foreign exchange company that is willing to take the lowest margin on a trade. I know this not just from my general experience, but have been told so by numerous customers throughout the years. In competing in the foreign exchange market I do not use specific knowledge gained from Travelex, I use my knowledge of the industry and the flexibility of now working for a smaller, more aggressive foreign exchange company.

17. I was responsible for handling the foreign exchange needs of approximately 250 customers[5]. While most of these customers were provided to me by Travelex, I did enlist some new customers myself. Of these customers, most hardly traded during my last year of employment at Travelex or did not trade at all. Out of the 250 customers, less than one-third were active (approximately 75-80). Travelex is fully aware of this as they had a monthly "dormant customer" list. Again, tellingly, this is not attached to Travelex's submission.

18. I recall specifically that Delta Airlines, a customer on my list, had not traded for at least nine months to year before I resigned. To my knowledge, none of these customers had any exclusive foreign exchange trading agreement with Travelex and would use other foreign exchange companies to effect some of their trades.

19. There was also no singular knowledge I had about these customers which would have resulted in them changing the foreign exchange companies with which they traded. The knowledge of a customer's preferences, if they had any, such as method of payment to the foreign exchange company, is certainly not a significant competitive advantage. Nor was it something which could not be learned from a phone call or two. It was primarily the development of a relationship that kept customers coming back to me for quotes. But these

---

[5] Travelex claims I had 300 customers on my list. To my recollection that figure is incorrect.

companies also made call to various other foreign exchange companies to get the best rate quote, as confirmed by various customers. If mine was not the best quote they would take their trade elsewhere.

20. In addition to the customers that were assigned to me, all corporate traders were required to cover the other traders if they were unavailable to take a call. I had very little contact with any of these customers as I was just filling in for the other trader who handled this customer regularly. I had no real relationship with them and could not provide the names of most of those entities.

21. While Travelex generally asserts that there were many aspects of their business which constitute confidential information, there is no confidential information that I know of, or had privy to, which was involved in the performance of my job or that would be helpful in my new job. Travelex provided me with training to understand and service the foreign exchange market. While Travelex may have had some proprietary trading programs, I had no intimate knowledge about them, how they may be used or how the systems worked. Any advantages that I have arises from my ability to understand and track the market using whatever tools are provided, not from understanding the design of a program or system that Travelex may have implemented. In fact, before coming to work at Travelex I worked for the Chief Economist of the Bank of Montréal. Most of the processes I use to gauge the market are based upon my experience from that position, not Travelex.

22. Upon starting my employment at AFEX I reached out a few customers with whom I had done business at Travelex. I had no list to look at but there were certain people that I remembered, especially those with whom I had developed a personal relationship. In fact, one

of the customers that I brought to Travelex I met on vacation and he has become a family friend. I have gone to baseball games with another customer.

23. Having their names, I conducted a search on the internet through the Google search engine. I called those people with whom <u>I had a personal relationship</u> just to let them know I left Travelex and to give them my new contact information. I did not solicit these customers. They responded that they were happy to hear from me as they did not know where I went. They had called Travelex and were told that I was not longer employed by Travelex but were given no new contact information. They each told me that I should send them more information as they would like to do business with me, wherever I was. I did so at their request.

24. While I called some other former customers and followed up with emails, such as those attached to the Powers affidavit, it was the customers with whom I had close personal relationships that sought me out.

25. I have not maligned Travelex in any way. I have not divulged any Travelex information which I believe to be of a confidential nature. The only customers of Travelex with whom I am currently doing business are those personal contacts who were looking for me after I left Travelex.

WHEREFORE, Travelex's application should be denied in its entirety, and the Court should grant such other and further relief as this Court may deem just and proper.

                                                                       LEIGHANNA MORBEY

Sworn to before me this
29th day of November, 2007

_____
Notary Public

JEFFREY C. RUDERMAN
NOTARY PUBLIC, STATE OF NY
02RU N̶o̶.̶01-5003389
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXP. FEBRUARY 27

9